**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
In re                                                                                  Chapter 11

ARCAPITA BANK B.S.C.(c), *et al.*                                  Case No. 12-11076 (SHL)

                Reorganized Debtors.                          (Jointly Administered)
----------------------------------------------------------------x


## MEMORANDUM OF DECISION


A P P E A R A N C E S:

GIBSON, DUNN & CRUTCHER LLP
*Counsel to the Debtors and Debtors-in-Possession*
  By:  Michael A. Rosenthal, Esq.
        Craig H. Millet, Esq.
        Matthew K. Kelsey, Esq.
200 Park Avenue
New York, New York 10166-0193

MILBANK, TWEED, HADLEY & McCLOY LLP
*Counsel for the Reorganized Debtors and the New Holding Companies*
  By:  Dennis F. Dunne, Esq.
        Evan R. Fleck, Esq.
        Lena Mandel, Esq.
1 Chase Manhattan Plaza
New York, New York 10005

DLA PIPER LLP (US)
*Counsel for National Bank of Bahrain B.S.C.*
  By:  Daniel G. Egan, Esq.
1251 Avenue of the Americas
New York, New York 10020

-and-

  By:  Richard A. Chesley, Esq.
        Daniel M. Simon, Esq.
203 N. LaSalle Street, Suite 1900
Chicago, Illinois 60601

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the objection of the above-captioned debtors and reorganized debtors (collectively, the "Debtors") to claim number 45 (the "Claim"), filed by National Bank of Bahrain ("NBB") against Arcapita Investment Holdings Limited ("AIHL"), one of the Debtors, in the amount of US$10,000,000. The Debtors seek to expunge the Claim because it relates to a call option on stock of a non-Debtor subsidiary under which NBB has suffered no loss. For the following reasons, the Court grants the Debtors' objection.

## BACKGROUND

The Debtors operated as an investment bank headquartered in Bahrain and were a leading global manager of Shari'ah-compliant alternative investments. On March 19, 2012 (the "Petition Date"), the Debtors filed for relief under Chapter 11 of the Bankruptcy Code.

In 2007, NBB entered into a *Master Murabaha Facility Agreement* (the "Facility Agreement") with Riffa Views B.S.C.(c) ("Riffa Views"), a non-Debtor entity. Under the Facility Agreement, NBB provided a loan to Riffa Views for the development of real estate located in Bahrain. The Facility Agreement was amended several times to, among other things, provide additional financing to Riffa Views. In connection with the Second Amendment to the Facility Agreement in 2009, NBB and Arcapita Bank B.S.C.(c) ("Arcapita Bank"), one of the Debtors, entered into an *Irrevocable Guarantee to National Bank of Bahrain*, under which Arcapita Bank agreed to guarantee the payment of the Riffa Views loan in an amount up to 10,000,000 Bahraini Dinar ("BD"), which is approximately $26,595,745.

The Facility Agreement was again amended several times to provide additional financing to Riffa Views and to extend the maturity date. Due to the increase in debts owed by Riffa Views to NBB, Arcapita Bank and NBB subsequently entered into a new *Irrevocable Guarantee*

2

*to National Bank of Bahrain* (the "Guarantee") that by its terms superseded the original guarantee and increased the amount to BD49,906,331, or approximately $132,729,604.

In connection with the Guarantee, NBB, Debtor AIHL and Waterwarf Holdings Limited, a wholly owned indirect subsidiary of AIHL, entered into a *Promise to Sell Shares Agreement* in 2009 (the "Share Agreement"). The Share Agreement provided that if Arcapita Bank failed to make payments under the Guarantee, NBB could exercise a right to purchase up to US$10,000,000 in shares of Waterwarf Holdings Limited from AIHL. The Share Agreement was meant to provide additional security for NBB in the event that Arcapita Bank failed to perform under the Guarantee.

Section 4.2.2. of the Share Agreement further provided that NBB "may, at its sole discretion, elect to deduct or set-off from the Purchase Price any amounts due by Arcapita Bank to [NBB]." Agreement ¶ 4.2.2. Thus, if NBB elected to exercise its right to a deduction or set-off, the transfer of the shares to NBB would serve as a partial payment of indebtedness owed by Arcapita Bank to NBB.

In May 2012, NBB sent a notice of default to Riffa Views (with a copy to Arcapita Bank) notifying them of an event of default under the Murabaha Facility Agreement and accelerating the loan. NBB asserts that Arcapita Bank is liable under the Guarantee for the outstanding balance of the loan in the amount of BD47,051,455, which is approximately $125,136,847. As a result of Arcapita Bank's failure to make payments under the Guarantee, NBB also filed the Claim against AIHL in the amount of US$10,000,000 based upon its rights under the Share Agreement. The Debtors objected only to the Claim against AIHL in the *Debtors' Second Omnibus Objection to Claims* [Docket No. 1050] and a hearing on the matter was held on December 17, 2013.

3

**DISCUSSION**

Fed. R. Bankr. P. 3001(f) provides that "a proof of claim executed and filed in accordance with [the Bankruptcy Rules] constitutes *prima facie* evidence of the validity and amount of the claim." Thus, when a claim is properly filed, the objecting party bears the initial burden of persuasion, and must produce "evidence equal in force to the *prima facie* case . . . which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." *In re Oneida, Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009) (internal citations and quotations omitted). The burden then shifts to the claimant, who must "prove by a preponderance of the evidence that under applicable law the claim should be allowed." *Id.*

Section 101(5) defines a "claim" as a

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or . . .

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. 101(5). It is true that "Congress unquestionably expected this definition to have wide scope. . . At the same time, however, the definitions reach is not infinite." *PBGC v. Oneida Ltd.*, 562 F.3d 154, 156-67 (2d Cir. 2009).

The Debtors raise several arguments in their objection. They first argue that there is no valid claim against AIHL because the Claim is based on a call option for the shares of a non-Debtor subsidiary, Waterwarf Holdings Limited. The Court disagrees that there is no claim simply because it involves the shares of a non-debtor. Section 541(a) of the Bankruptcy Code provides that property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." The definition of property of the estate is

4

interpreted broadly, and "every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of [Section] 541." *Chartschalaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008). NBB notes (and the Debtors do not deny) that AIHL currently holds shares in Waterwarf. The broad definition of property of the estate clearly encompasses a debtor's interest in another corporation's stock. *See Kolinsky v. Russ (In re Kolinsky),* 100 B.R. 695, 701 (Bankr. S.D.N.Y. 1989); *In re Deak & Co, Inc.*, 63 B.R. 422, 427 (Bankr. S.D.N.Y. 1986). Thus, to the extent that NBB has a claim, there appears to be no reason NBB cannot assert it against AIHL based upon AIHL's ownership interest in the Waterwarf Holdings shares.[1]

The Debtors next argue that NBB's rights under the Share Agreement fail to qualify as a claim because NBB has not suffered a loss that would give rise to a claim. The Debtors note that the Share Agreement gives NBB the opportunity to purchase Waterwarf shares from AIHL at fair market value. They argue that NBB would enjoy no gain upon consummation of the transaction because the value of the Waterwarf shares purchased would be exactly the same as their purchase price. The Court agrees that NBB's contractual rights under the Share Agreement do not constitute a claim, since those rights do not give rise to a right to payment.

The definition of "claim" includes both a "right to payment" and a "right to an equitable remedy for breach of performance *if such breach gives rise to a right to payment*." 11 U.S.C. § 101(b). (emphasis added). Thus, "[w]here the same breach gives the aggrieved party the alternative of an equitable remedy or money damages, the resulting right is a 'claim.'" *In re Mark IV Indus., Inc.*, 438 B.R. 460, 465 (Bankr. S.D.N.Y. 2010). But courts in this jurisdiction have noted that "[c]onversely, where a creditor does not have the option to accept money in lieu

---

[1] Indeed, AIHL appeared to have dropped their objection to the Claim on this basis during the hearing on December 17, 2013. But to the extent this argument was not abandoned by AIHL, the Court rejects it.

of the equitable remedy, the equitable obligation is not a 'claim' and is not dischargeable in bankruptcy." *Id.* While the definition of what constitutes a 'claim' is interpreted broadly, "[a]s enacted . . . Section 101[5][B] limits the definition of claims by excluding rights to an equitable remedy for a breach of performance with respect to which such a breach does not give rise to a right to payment. Such rights are not 'claims'. . . ." 2-101 Collier on Bankruptcy ¶ 101.05[5] (16th ed. 2014).

NBB counters that the right created in the Share Agreement is not a bare right to enforce conveyance of the shares and cites to its contractual setoff right under the Share Agreement as an alternative right to payment. NBB argues that its set-off right is "tantamount in substance to a right to payment as required by section 101(5) of the Bankruptcy Code" since such election would reduce the amount owed to NBB by up to $10 million. (NBB Objection, ¶ 16).

As a general matter, however, the setoff right asserted here is unenforceable in bankruptcy. The type of setoff contemplated by the Share Agreement is commonly referred to as a triangular setoff, which is the right to set off amounts owed to affiliates of a counterparty. Said another way, NBB seeks to assert a right to offset against AIHL, although the debt in question is owed by Arcapita Bank. As correctly noted by the Debtors, triangular setoffs are commonly disallowed in bankruptcy due to a lack of mutuality. Section 553(a) of the Bankruptcy Code provides that "this title does not affect any right of a creditor to offset a *mutual debt* owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arouse before the commencement of the case . . . ." 11 U.S.C. § 553(a) (emphasis added). Thus, "to be eligible for setoff under [S]ection 553, (1) the amount owed by the debtor must be a prepetition debt; (2) the debtor's claim against the creditor must also be prepetition; and (3) the debtor's claim against the creditor and the debt

owed the creditor must be mutual." *In re Lehman Bros., Inc.*, 458 B.R. 134, 139 (Bankr. S.D.N.Y. 2011) (internal citations and quotations omitted). "[C]ourts consistently find debts to be mutual only when they are in the same right and between the same parties." *Id.* at 140 (internal citations and quotations omitted); *see also In re SemCrude*, 399 B.R. 388, 393 (Bankr. D. Del. 2009).

The fact that the setoff was provided for by contract does not alter this conclusion. As the court in *Lehman* observed:

> Section 553 expressly preserves the "right of a creditor to offset a mutual debt owing by *such creditor* to the debtor . . . against a claim of *such creditor* against the debtor". . . The clarity of this language is conclusive – mutuality quite literally is tied to the identity of a particular creditor that owes an offsetting debt. The right is personal, and there simply is no ability to get around this language. Parties may freely contract for triangular setoff rights, but not in derogation of these mandates of the Bankruptcy Code.

*Lehman*, 458 B.R. at 141 (quoting 11 U.S.C. § 553); *see also SemCrude*, 399 B.R. at 396-99 ("[M]utuality cannot be supplied by a multi-party agreement contemplating a triangular setoff."). Thus, the setoff relied upon by NBB does not create a right to payment that is recognizable under the Code.

NBB reasons that it does not actually seek to effectuate a setoff, but rather that its right to setoff was an alternative right to payment. It further contends that simply because a triangular setoff was prohibited under the Bankruptcy Code, does not mean that a creditor could not make a claim on that basis. The Court disagrees. While NBB is not seeking to enforce its setoff right, it is invoking that right as the basis for the Claim. And the Court disagrees that a setoff constitutes a right to payment. Rather, it is a right to pay less on the claimant's own liability. "[A] right to effect a setoff can never impose a 'right to payment,' it only can yield a right to pay less than one would otherwise have to pay." *In re SemCrude*, 399 B.R. at 398. So while a party "may be able

7

to assert a state law right to the equitable remedy of setoff, this right is not based on a breach of performance that gives rise to a 'right to payment . . . ." A setoff agreement . . . only creates a right to pay less or nothing, not a right to receive a payment." *Id.*

At the hearing on the Debtors' motion, counsel to NBB cited for the first time to various other provisions of the Share Agreement that had not been raised in its pleadings. Counsel to AIHL did not have prior notice or opportunity to respond to these new arguments. *See, e.g., Unsecured Claims Estate Representative of Teligent, Inc. v. Cigna Healthcare, Inc. (In re Teligent, Inc.)*, 326 B.R. 219, 229 (S.D.N.Y. 2005) (bankruptcy court has the discretion not to consider argument raised for the first time in reply papers). In any event, these additional provisions do not help NBB. Specifically, NBB argued that the right to acquire shares under Sections 2 and 3.1 of the Share Agreement constituted a claim under Section 101(5)(b). Section 2 of the Share Agreement provides that

> In consideration of the payment by NBB of US$10 to the Company (receipt of which is hereby taken to be acknowledged) the Company grants to NBB the right, but not the obligation, during the Purchase Period to acquire the Promised Shares at the Purchase Price Per Share[2] on the terms set out in this Agreement upon the occurrence of a Trigger Event.

Section 3.1 of the Share Agreement provides

> Upon the occurrence of a valid Trigger Event during the Purchase Period, NBB may exercise its Purchase Right by servicing the Company and the Target with a Promise to Sell Shares Notice specifying NB's preferred date of Completion, which must be a Business Day within the Purchase Period.

But NBB did not explain how these provisions constitute anything more than a bare requirement to convey the property – that is, a right to equitable relief. Such right is not a claim:

> [R]ights to an equitable remedy for breach of performance with respect to which such breach does not give rise to a right to payment are not "claims" within the

---

[2] Purchase Price Per Share is defined in the Share Agreement as "an amount in [United States dollars] to be determined on or around the Exercise Date which amount reflects the Fair Market Value of the Target's shares on the Exercise Date. (Share Agreement, § 1.1).

8

> Code's contemplation, and would not therefore be dischargeable in bankruptcy, unless such obligations could be translated into a claim for damages if breached. When there is no money damage alternative to state court ordered equitable remedies such as resulting trust, partition in kind, or deed reformation, they do not fit the definition of claim under [S]ection 101(5) . . . .

2-101 Collier on Bankruptcy ¶ 101.05[5] (16th ed. 2014); *see also Route 21 Assoc. of Belleville, Inc. v. MHC, Inc.*, 486 B.R. 75, 88-9 (S.D.N.Y. 2012) (noting that "[s]everal courts have held that a claimant's right to certain equitable remedies constitutes a 'claim' if an award of monetary damages is a 'viable alternative' to the equitable remedy sought.") (quoting *In re Ben Franklin Hotel Assocs.*, 186 F.3d 301, 305 (3d Cir. 1999)).  Even to the extent that any equitable remedy for breach of performance were available to NBB, such right could not be translated to a claim for damages since NBB was only given the right to purchase the shares at fair market value in any case.  NBB would therefore simply be expending the same amount of money as the stock was worth and would enjoy no gain upon consummation of the transaction because the value of the Waterwarf shares purchased would be exactly the same as their purchase price.[3]  As noted above, "[a]s enacted . . . Section 101[5][B] limits the definition of claims by excluding rights to an equitable remedy for a breach of performance with respect to which such a breach does not give rise to a right to payment.  Such rights are not 'claims'. . . ." 2-101 Collier on Bankruptcy ¶ 101.05[5] (16th ed. 2014); *see also In re Mark IV Indus.*, 438 B.R. at 465.

In its objection, NBB also requested that the Court, in the alternative, find that any equitable right of NBB to enforce the Share Agreement would pass outside of bankruptcy and not be subject to the automatic stay or discharge in bankruptcy.  At the hearing held on December 17, 2013, counsel clarified that these arguments were merely a reservation of rights,

---

[3] Indeed, neither party discusses where the value in an equitable remedy would be.  One way to understand the Share Agreement is that the value was in the setoff itself, which, as noted above, is unenforceable in this bankruptcy.

not an objection. (*See* Hr'g Tr. 24:1-3, Dec. 17, 2013). The Court therefore need not address those arguments now on the merits. NBB's rights outside of bankruptcy are what they are.[4]

## CONCLUSION

For the reasons set forth above, the Debtors' objection to the Claim is granted. The Debtors are directed to submit an order on three days' notice.

Dated: New York, New York
      May 20, 2014

                                              */s/ Sean H. Lane*
                                              UNITED STATES BANKRUPTCY JUDGE

---

[4] The Debtors also argued that, to the extent NBB's rights under the Share Agreement did constitute a claim, that claim would be subordinated under Section 510(b) of the Bankruptcy Code. But as the Court has ruled that NBB does not have a claim, it is unnecessary to address the subordination argument. In any case, the Court could not grant such relief on the current record as the Debtors raised their arguments on subordination in their reply brief, without first filing an adversary proceeding as required under Bankruptcy Rules 3007 and 7001.